IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PRECISION AGGREGATE PRODUCTS, L.L.C., a Nevada limited liability company,<br><br>                      Plaintiff,<br><br>v.<br><br>CMI TEREX CORPORATION d/b/a TEREX ROADBUILDING, an Oklahoma corporation,<br><br>                      Defendant. | No. CIV-06-1146-L |

## O R D E R

On October 17, 2006, plaintiff filed this action seeking rescission and damages for breach of contract, breach of warranties, deceit, and fraud arising out of defendant's sale of a concrete batch plant and silo to plaintiff. This matter is before the court on the motions for summary judgment. Defendant seeks judgment in its favor on plaintiff's claims for rescission, breach of contract, fraud in the inducement, deceit, breach of implied warranties, and violation of Oklahoma's Deceptive Trade Practices Act. In turn, plaintiff seeks judgment in its favor on its claim for breach of express warranties.

Summary judgment is appropriate if the pleadings, affidavits, and depositions "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Any doubt as to the

existence of a genuine issue of material fact must be resolved against the party seeking summary judgment.  In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. Board of Education v. Pico, 457 U.S. 853, 863 (1982).  Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact; rather, the party "must set forth *specific* facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added).  *See also*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  In addition, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

      The undisputed facts establish that plaintiff produces and supplies redi-mixed concrete throughout the State of Nevada and to surrounding states.  Exhibit 1 to Plaintiff's Motion for Partial Summary Judgment on Count VII of the Complaint at ¶ 2 [hereinafter cited as "Plaintiff's Motion"]. Defendant manufactures large equipment that is used in the production of redi-mixed concrete, including the equipment at

issue in this action, the Rustler R3 portable concrete batch plant. Id. at ¶ 3. The Rustler R3 is a mobile concrete plant that is used to weigh or measure the various components of concrete (sand, aggregate, cement, and water) and then deliver the components to a transit mix truck where they are mixed to create concrete. In late September 2005, plaintiff began negotiations with defendant for the purchase of a Rustler R3 plant. Id. at ¶ 4. During the negotiations, defendant furnished a brochure that detailed the specifications of the plant. Id. at ¶ 5; Exhibit 3 to Plaintiff's Motion. The specifications reflect the plant has a "13-ft 6-in (4.1-m) transit mix charging height". Exhibit 3 to Plaintiff's Motion at 2. The initial equipment proposal submitted by defendant reiterated that "[o]n level ground, the Rustler III features a 13'-6" transit mix truck charging height." Exhibit 4 to Plaintiff's Motion at 2. Charging height is the amount of clearance provided for mix trucks to pull under the plant for loading. Exhibit 1 to Plaintiff's Motion at ¶ 6. Front discharge mix trucks, which are higher than rear discharge trucks, have a total truck height of 13-feet 2-inches. Id. at ¶ 7. Both types of trucks require clearance that is a few inches higher than the total truck height. Plaintiff uses both front discharge and rear discharge mix trucks. Id. Defendant does not dispute that the 13-feet 6-inch charging height was a material term of the parties' contract.

On October 4, 2005, defendant provided plaintiff with the third and final version of the equipment proposal. Id. at ¶ 9. The next day, Travis Eaton, plaintiff's managing member, executed the equipment sales order for a Rustler R3 batch plant

3

and an auxiliary silo. Id. at ¶ 10; Exhibit 6 to Plaintiff's Motion at 1. The contract was executed by defendant twelve days later. Exhibit 6 to Plaintiff's Motion at 1. The contract does not contain a shipping date; rather, it indicates "will advise" for the date of shipment. Id. The terms of sale in both the final equipment proposal and the equipment sales order contain an express warranty that

> Seller warrants equipment covered by this agreement and manufactured by Seller, against defects in material or manufacture for a period of twelve (12) months, after date of delivery . . . provided that Buyer sends Seller written notice of the defect within thirty (30) days of its discovery and establishes that: (i) the equipment has been maintained and operated within the limits of rated and normal usage; and (ii) the defect did not result in any manner from the intentional or negligent action or inaction by Buyer, its agents or employees.

Exhibit 5 to Plaintiff's Motion at 12; Exhibit 6 to Plaintiff's Motion at 2. Pursuant to the contract, plaintiff was limited to repair or replacement of any defective equipment[1] covered by the express warranty; defendant disclaimed all implied warranties.[2] The

---

[1] The section labeled "Remedies for Breach" provides that "IN THE EVENT OF ANY BREACH OF THE WARRANTY BY SELLER, THE PARTIES AGREE THAT SELLER'S LIABILITY SHALL BE LIMITED EXCLUSIVELY TO THE REMEDIES OF REPAIR OR REPLACEMENT OF ANY DEFECTIVE EQUIPMENT COVERED BY THE WARRANTY." Id. (emphasis in original).

[2] The warranty provision provides: "THIS WARRANTY IS EXPRESSLY IN LIEU OF AND EXCLUDES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED (INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE) AND ALL OTHER OBLIGATIONS OR LIABILITY ON SELLER'S PART. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE DESCRIPTION ON THE FACE OF THIS AGREEMENT." Id. (emphasis in original).

contract also expressly excluded defendant's liability for consequential and incidental damages, whether due to delay in delivery or to breach of warranty.[3]

Defendant delivered the Rustler R3 to plaintiff on October 31, 2005; the auxiliary silo was delivered sixteen days later. Exhibit 1 to Plaintiff's Motion at ¶ 12. After the silo was delivered, two of defendant's employees, Harold Vandeventer and Randy Logan, oversaw installation of the plant and the silo at plaintiff's work site. Exhibit F to Defendant's Motion for Summary Judgment at 148-51. During the initial set-up, the parties discovered that the charging height for the plant was only 13 feet ½ inch, rather than the 13 feet 6 inches stated in the specifications and equipment proposal. In addition, defects in the water tank and water tank float valve assembly were readily apparent. Exhibit 1 to Plaintiff's Motion at ¶ 13; Exhibit 2 to Plaintiff's Motion at 156, 158-59; Exhibit 7 to Plaintiff's Motion at 92-93, 173; Exhibit 10 to Plaintiff's Motion at 32, 34-35. In December 2005, Randy Logan, defendant's Regional Sales Manager, reported:

> The plant does not elevate to 13'6"; it sits at 13' ½". **I couldn't adjust the height any higher.**
>
> * * *

---

[3]The contract provides that "Seller SHALL NOT BE LIABLE FOR ANY LOSS OF USE OR FOR ANY OTHER INDIRECT, CONSEQUENTIAL, INCIDENTAL OR OTHER DAMAGES OR LOSSES DUE TO DELAY IN SCHEDULED DELIVERY." Id. (emphasis in original). Likewise, the remedies section stipulates that "[i]n no event shall Seller, or any subsidiary or division thereof be liable for incidental, consequential or other damages or losses resulting from breach of warranty including, without limitation, labor costs, loss of use of other equipment, third party repairs, personal injury, emotional or mental distress, improper performance or work, penalties of any kind, loss of service of personnel, or failure of equipment to comply with any federal, state or local laws." Id.

> The water float that controls the flow of water to the water tank was sticking. Thus overflowing. The knuckle and pivot point was rubbing against the bottom of the cover plate; there was no tolerance between the two metals thus rubbing a hole in the cover plate. . . .
>
> The customer had to cut the concrete slab to get their fronts [front discharge mix trucks] under the plant.
>
> Now the rear discharge trucks have a rough time lining up under the cement and aggregate/water tubes manifold; causing a mess on the ground.

Exhibit 8 to Plaintiff's Motion (emphasis in original). As noted in Logan's memorandum, plaintiff attempted to work around the charging height issue by removing the concrete lane the mix trucks used to position themselves under the concrete batcher and conveyer. This, however, was only a temporary solution and did not resolve the charging height issue. Exhibit 1 to Plaintiff's Motion at ¶15; Exhibit 2 to Plaintiff's Motion at 156, 167-168. The float valve assembly was also temporarily fixed during the initial set-up; this solution was likewise not intended to permanently resolve the problem. Exhibit 2 to Plaintiff's Motion at 185-86. Defendant does not dispute that it was timely and adequately notified of these and other defects with the batch plant or that the lowered charging height, water tank, and float valve assembly

were covered under the express warranty.[4]  The parties do, however, dispute whether defendant's response to the defects was appropriate.

On December 21, 2005, defendant sent a letter to plaintiff offering to make the following repairs:

> 1. Grind the welds on the in truss silo weldment and supporting structure and weld them correctly.  Our intention is to have at least two welders to work on the plant for 2-3 days.  During this time the plant will not be able to operate.
>
> 2. Install a stabilize gusset plate between the silo fill line and the silo shell.
>
> 3. Provide the parts and install an aggregate batcher extension to eliminate the material spillage on the air compressor side.
>
> 4. We will replace the water valve for the water holding tank with the correct clearance between the lid and the water valve mechanism.
>
> 5. As a sign of good faith and to alleviate [your] height problem with front discharge trucks we will exchange the pads you are currently using with a set that will allow you to raise the plant up to a total of 13'-7¾" steel clearance [below] the truck shroud.  We are also going to provide you at no extra cost a longer Gum rubber shroud for the conveyor discharge head

---

[4]In its response to plaintiff's motion, defendant asserts that Logan "initially testified that he could not answer whether or not the height issue was covered by the warranty on the Rustler 3." Defendant's Response to Plaintiff's Motion for Partial Summary Judgment on Count VII of the Complaint at 2 [hereinafter cited as "Defendant's Response"].  This assertion, however, ignores Logan's specific, affirmative response to the question, "At that time [November 2005], was it your opinion that the height was covered, the charging height was covered under the warranty to the extent it did not comply with the specifications?"  Exhibit 2 to Plaintiff's Motion at 214.  Logan also indicated the problems with the water tank and float valve assembly were covered by the express limited warranty.  Id. at 216.

>   and cement chute to compensate for the height
>   change.

Exhibit 4 to Defendant's Response. On December 27, 2005, counsel for plaintiff sent defendant a letter rejecting the batch plant and requesting a refund of the purchase price. Exhibit 5 to Defendant's Response. Despite this letter, the parties continued to negotiate regarding repairs. *See* Exhibits 6, 7, 8, and 9. At some point during 2006, the parties stopped communicating. On August 17, 2006, plaintiff's counsel sent a letter entitled "NOTICE OF DEFECT - DEMAND FOR WARRANTY SERVICE" to defendant. Exhibit 15 to Plaintiff's Motion. The letter concluded:

> In the event that all of these defective items are not finally and completely resolved within twenty (20) days from the date of this letter, please be advised that my client will immediately file a lawsuit against Terex, where it will seek to recover all of its damages that have resulted from Terex's failure to warrant the product as promised, all lost profits, and other damages that have resulted from Terex's delays in delivering the product and downtime caused by the defective batch plant.

Id. In October 2006, plaintiff stopped using the batch plant and filed this action. Exhibit 1 to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at ¶ 12. In December 2005, defendant sent a new water tank and float valve assembly to plaintiff, but plaintiff refused delivery. Exhibit L to Defendant's Motion for Summary Judgment at ¶ 3. Plaintiff stored the plant until April 2007, when it sold it for defendant's account. Id. at ¶ 14.

Defendant seeks summary judgment on all of plaintiff's claims except the claim for breach of express warranty. As stated in its complaint, plaintiff's first claim seeks rescission due to fraud in the inducement and breach of contract. Based on plaintiff's response to defendant's motion for summary judgment, it appears to have abandoned the fraud in the inducement argument for rescission. Instead, it argues that rescission is appropriate because consideration for the contract failed due to defendant's breach of its express warranty. Defendant counters that plaintiff cannot seek rescission because it did not properly reject the plant and its actions after the purported rejection in December 2005 constitute acceptance. This matter is governed by Article 2 of the Uniform Commercial Code as adopted in Oklahoma. Section 2-606(1) provides that a buyer accepts goods if, after a reasonable opportunity to inspect, the buyer tells the seller the good are conforming or that it will accept the goods despite the nonconformity, or the buyer fails to effectively reject the goods, or the buyer does any act inconsistent with the seller's ownership. 12A O.S. § 2-606. Defendant argues plaintiff's continued use of the Rustler R3 together with its sale of the plant were clearly "inconsistent with the seller's ownership". The court agrees that plaintiff's continued use of the plant after the December 2005 rejection notice constitutes acceptance. Acceptance, however, can be revoked.

> In Oklahoma, a buyer may revoke his acceptance of goods of a nonconforming nature by notifying the seller within a reasonable time. The question of whether a buyer's revocation of an acceptance is timely is, as with rejection, a question of fact. A buyer who properly revokes has the

> same rights with regard to the goods involved as if he had rejected them.

CMI Corp. v. Leemar Steel Co., Inc., 733 F.2d 1410, 1415 (10th Cir. 1984). One of the rights a buyer has upon revocation is the right to cancel – that is, to rescind – the contract. 12A O.S. § 2-711(1). The issue, therefore, is whether plaintiff properly revoked its acceptance. This issue, however, cannot be determined on summary judgment as genuine issues of material fact exist with respect to whether plaintiff's alleged revocation was seasonable.[5] Defendant is thus not entitled to summary judgment on plaintiff's first claim for relief.

Likewise, defendant is not entitled to judgment in its favor on plaintiff's breach of contract claim, with one exception. In addition to other breaches, plaintiff contends defendant violated the contract by failing to deliver the silo on time. Plaintiff argues defendant made "numerous promises, made before the execution of the Contract, that the Batch Plant and Silo would be delivered by the first week of November 2005". Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 19. The parties' contract, which does not contain a delivery date, does have a merger clause that specifies "[t]his agreement constitutes the entire agreement between the parties . . . . Seller shall not be bound by any agent's, employees or dealer's representation, promise or inducement not set forth herein." Exhibit 6 to

---

[5]"Whether a party's revocation of acceptance is effective in any given case is dependent upon the facts and circumstances surrounding the revocation, and is normally a question for the trier of fact." Triad Systems Corp. v. Alsip, 880 F.2d 247, 249 (10th Cir. 1989).

Plaintiff's Motion at 2.  Under Oklahoma law, parol evidence cannot be used to supplement the terms of a contract for the sale of goods if the court finds the parties' written agreement was intended to be "a complete and exclusive statement of the terms of the agreement." 12A O.S. § 2-202(b).  Based on the integration clause, the court finds the parties' agreement as reflected in the equipment sales order "was meant to be an entire and exclusive statement of the contract terms". Dave Markley Ford, Inc. v. Lair, 565 P.2d 671, 673 (Okla. 1977).  Thus, plaintiff's evidence regarding the delivery date is not admissible and defendant is entitled to summary judgment on this issue. Id.

Counts III and IV of the complaint seek damages for fraud in the inducement and deceit.  Plaintiff claims defendant misrepresented the capacity of the Rustler R3 as 12 yards, when it knew the plant had a maximum capacity of 10 yards.  In order to establish deceit or fraud in the inducement, plaintiff must demonstrate by clear and convincing evidence[6] "(1) a material misrepresentation; (2) known to be false at the time made; (3) made with specific intent that a party would rely on it; and (4) reliance and resulting damage." Thrifty Rent-A-Car Systems, Inc. v. Brown Flight Rental One Corp., 24 F.3d 1190, 1195 (10th Cir. 1994).  In response to defendant's motion, however, plaintiff simply states "[t]he record contains sufficient evidence to

---

[6]"It is a settled rule in Oklahoma that fraud is never presumed and where a written agreement is attacked on the ground of fraud, that agreement will be upheld unless the allegations of fraud are established by clear and convincing evidence." Funnell v. Jones, 737 P.2d 105, 108 (Okla. 1985), *cert. denied*, 484 U.S. 853 (1987).

11

submit these claims to the finder of fact, thereby precluding summary judgment." Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 21. This is patently insufficient. A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Moya v. United States, 35 F.3d 501, 503 (10th Cir. 1994). Plaintiff bears the burden of proof on its fraud and deceit claims. Thus, because defendant has pointed out there are no facts or evidence to support these claims, it is plaintiff's burden to produce evidence showing that there is a genuine issue for trial on each claim. As plaintiff has not done so, defendant is entitled to judgment. See Celotex Corp., 477 U.S. at 324.

Defendant is also entitled to judgment in its favor on plaintiff's claims for breach of implied warranties. As noted above, defendant expressly disclaimed the implied warranties of merchantability and fitness for a particular purpose. Oklahoma law allows a seller to exclude these warranties, provided the limitations are conspicuous. 12A O.S. § 2-316(2). There is no dispute that the disclaimers in this case were conspicuous. Nonetheless, plaintiff argues "[w]here an express warranty fails of its essential purpose, an implied warranty may be found". Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 15. In support of this contention, plaintiff cites Osburn v. Bendix Home Systems, Inc., 613 P.2d 445, 450 n. 16 (Okla. 1980). That case, however, is inapposite. Osburn stands for the

proposition that a buyer is relieved of a contract-imposed limitation on *remedies* if that limited remedy fails of its essential purpose.[7] Id. at 450. The implied warranties of merchantability and fitness for a particular purpose are warranties – that is, promises – not remedies under the Code. The implied warranties were properly disclaimed under the Code and cannot be revived based on the alleged failure of the limited remedy. Defendant is entitled to dismissal of plaintiff's implied warranty claims.

Neither party, however, is entitled to summary judgment on the claim for breach of express warranty. The court finds there are genuine issues of material fact regarding whether the limited remedy failed of its essential purpose. "Where the seller is afforded a reasonable opportunity to correct the defect and fails timely to respond or is repeatedly unsuccessful in the efforts to meet the warranty-imposed obligation, the limitation of remedy is deemed to have failed of its essential purpose". Osburn, 613 P.3d at 449-450. In this case, the court cannot say as a matter of law that defendant was given a reasonable opportunity to correct the defects. For that reason, the court cannot say at this juncture that plaintiff may not recover consequential or incidental damages. In Oklahoma, if a limited remedy fails of its essential purpose, the buyer is entitled to all remedies under the Code, including

---

[7]The Code specifically provides "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act." 12A O.S. § 2-719(2). In this case, the parties' contract limited the remedy to repair or replacement of defective equipment.

13

consequential and incidental damages.[8]  Anderson v. Dow Agrosciences LLC, 262 F. Supp. 2d 1280, 1291 (W.D. Okla. 2003); Osburn, 613 P.2d at 450; Collins Radio Co. of Dallas v. Bell, 623 P.2d 1039, 1051 (Okla. App. 1980).

Finally, the court concludes defendant is entitled to dismissal of plaintiff's claim under the Oklahoma Deceptive Trade Practices Act, 78 O.S. §§ 51-55.  The Deceptive Trade Practices Act protects business competitors; it does not provide a private right of action for consumers.  Conatzer v. Am. Mercury Ins. Co., 15 P.3d 1252, 1254 (Okla. App. 2000).  Plaintiff's request to amend its complaint to assert a claim under the Oklahoma Consumer Protection Act, 15 O.S. §§ 751-764.1, is denied as it comes on the eve of trial.

In sum, Defendant's Motion for Summary Judgment (Doc. No. 36) is GRANTED in part and DENIED in part.  Plaintiff's Motion for Partial Summary Judgment (Doc. No. 39) is DENIED.

It is so ordered this 31st day of October, 2007.

*/s/ Tim Leonard*
TIM LEONARD
United States District Judge

---

[8]The court recognizes this is no longer the majority rule and that the case relied on by the Oklahoma Supreme Court in Osburn has been abrogated.  *See* Razor v. Hyundai Motor America, 854 N.E.2d 607, 616-622 (Ill. 2006), *cert. denied*, 127 S. Ct. 1156 (2007) (*abrogating* Adams v. J.I. Case Co., 261 N.E.2d 1 (1970)).  Nonetheless, as the court is sitting in diversity, it must follow Oklahoma law as pronounced by the state's highest court.  Perlmutter v. U.S. Gypsum Co., 54 F.3d 659, 662 (10th Cir. 1995).