IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

PRECISION AGGREGATE                )
PRODUCTS, L.L.C., a Nevada         )
limited liability company,         )
                                   )
                  Plaintiff,       )
                                   )
v.                                 )        No. CIV-06-1146-L
                                   )
CMI TEREX CORPORATION              )
d/b/a TEREX ROADBUILDING,          )
an Oklahoma corporation,           )
                                   )
                  Defendant.       )

# MEMORANDUM OPINION

On October 17, 2006, plaintiff filed this action seeking rescission and damages

for breach of contract, breach of warranties, deceit, and fraud arising out of

defendant's sale of a concrete batch plant and silo to plaintiff.  On October 31, 2007,

the court issued an order granting defendant's motion for summary judgment and

dismissing plaintiff's claims for breach of implied warranties, deceit, fraud, and

violation of the Oklahoma Deceptive Trade Practices Act.  Plaintiff's remaining

claims for breach of contract[1] and breach of express warranty were tried to the court

without a jury on November 26-29, 2007.  In accordance with Fed. R. Civ. P. 52(a),

---

[1]In its summary judgment order, the court found genuine issues of material fact existed with
respect to all but one issue raised in plaintiff's breach of contract claim.  The court found plaintiff
could not present parol evidence to establish a delivery date for the auxiliary silo and thus could not
premise a breach of contract claim on that basis.  Order at 10-11 (Doc. No. 84).

this memorandum opinion constitutes the court's findings of fact and conclusions of law.

The evidence presented at trial[2] demonstrates plaintiff produces and supplies redi-mixed concrete and aggregate in Nevada and Arizona for public and private projects.  Concrete is produced using batch plants that weigh and measure the various components of concrete (sand, aggregate, cement, and water) and then deliver the components to redi-mix trucks.  In 2005, plaintiff owned two batch plants and leased another.  The leased plant and one of the owned plants were located in Las Vegas, Nevada, where, among other projects, plaintiff provided concrete for construction by the Las Vegas Valley Water District.  Plaintiff's other plant, which was considered a permanent plant, was located in Littlefield, Arizona; plaintiff, however, intended to move the Littlefield plant to Mesquite/Bunkerville, Nevada by January 2006.

In late September 2005, plaintiff began discussions with defendant to purchase a portable concrete batch plant.  Portable plants are made to be moved from location to location and can generally be moved in a day or two, with little preparation work required for the foundation.  In contrast, permanent plants require more foundation work and are more cumbersome to move.  Plaintiff informed defendant's Regional Sales Manager, Randy Logan, that it wanted a portable batch

---

[2]In addition to live testimony, both parties presented testimony via depositions, which the court has reviewed.  All objections to designated testimony are overruled.

plant that could hold and batch more than one type of aggregate, had a 12 cubic yard per batch capacity so it could easily batch 10 cubic yards of concrete, and had sufficient charging height so that plaintiff could load concrete into its front discharge mix trucks.[3]  Based on those requirements, Logan recommended plaintiff purchase defendant's Rustler III portable concrete batch plant.  Logan provided plaintiff's managing member, Travis Eaton, with a brochure that detailed the specifications of the Rustler III.  Plaintiff's Exhibit 2.  The brochure reflects the plant has a charging height of 13 feet 6 inches, which was sufficient for plaintiff to load its front discharge trucks.  Id. at 2.  In addition, Logan informed Eaton that plaintiff could purchase an auxiliary silo for use with the plant; this was important to plaintiff because it uses two cementitious materials, fly ash and cement, in producing concrete.

On October 3, 2005, defendant sent plaintiff the third version of its equipment proposal, which outlined the parties' agreement and reflected a total price for the various components of the plant and silo of $342,818.00 FOB point of origin. Plaintiff's Exhibit 6 at 9 of 11.  The proposal reiterated that "[o]n level ground, the RUSTLER III features a 13'-6" (4.1 m) transit mix truck charging height."  Id. at 1 of 11.  The payment terms specified that a 20 percent non-refundable down payment was due upon execution of the contract, with the balance due when the equipment

---

[3]Charging height is the amount of clearance provided for mix trucks to pull under the plant for loading.  Front discharge trucks are generally 13 feet 2 inches high, while rear load trucks are approximately 12 feet high.  Charging height needs to be a minimum of two inches higher than the truck height.  In 2005, plaintiff had a equal number of rear-load and front-load trucks.

was ready to ship.  Id.  On October 4, 2005, defendant transmitted two sales contracts to plaintiff for signature, noting that it "separated the silo and plant onto two orders due to the quick delivery of the plant."  Plaintiff's Exhibit 8 at 1 of 1.  That same date, plaintiff issued check in the amount of $68,000.00 as down-payment for the equipment.  Plaintiff's Exhibit 15 at 1.  Eaton executed the Equipment Sales Orders on October 5, 2005, and  Jim Johnson executed the contracts on behalf of defendant on October 17, 2005.  Plaintiff's Exhibits 13, 14.  The terms of sale in both the final equipment proposal and the Equipment Sales Orders contain an express warranty that:

> Seller warrants equipment covered by this agreement and manufactured by Seller, against defects in material or manufacture for a period of twelve (12) months, after date of delivery . . . provided that Buyer sends Seller written notice of the defect within thirty (30) days of its discovery and establishes that:  (i) the equipment has been maintained and operated within the limits of rated and normal usage; and (ii) the defect did not result in any manner from the intentional or negligent action or inaction by Buyer, its agents or employees.

Plaintiff's Exhibit 6 at 11 of 11; Plaintiff's Exhibit 13 at 2 of 2; Plaintiff's Exhibit 14 at 2 of 2.  The documents further limit the remedy available to plaintiff in the event of a defect.  The section labeled "Remedies for Breach" provides that "IN THE EVENT OF ANY BREACH OF THE WARRANTY BY SELLER, THE PARTIES AGREE THAT SELLER'S LIABILITY SHALL BE LIMITED EXCLUSIVELY TO THE REMEDIES OF REPAIR OR REPLACEMENT OF ANY DEFECTIVE EQUIPMENT COVERED BY THE WARRANTY."  Id. (emphasis in original).  The

parties' contract also expressly excluded defendant's liability for consequential and incidental damages, whether due to delay in delivery or to breach of warranty.[4]

The batch plant was delivered to plaintiff in Mesquite, Nevada on October 31, 2005 and plaintiff immediately began to set up the plant.  Plaintiff could not use the plant, however, until the silo was delivered and the computer was installed.  Harold Vandeventer, defendant's customer service representative, arrived in Mesquite on November 8, 2005 to assist plaintiff with installing the plant.  After the silo arrived in Mesquite on November 16, 2005, Vandeventer helped plaintiff complete the initial installation of the plant and auxiliary silo.  After the plant and silo were operational, plaintiff began running trial batches of concrete through the plant.[5]  It became immediately apparent that there were major defects in the equipment.  For example, the charging height for the plant was only 13 feet ½ inch, rather than the 13 feet 6 inches originally shown in the specifications and equipment proposal.  In order to accommodate its front-load trucks, plaintiff had to remove the concrete truck lane it

---

[4]The contract provides that "Seller SHALL NOT BE LIABLE FOR ANY LOSS OF USE OR FOR ANY OTHER INDIRECT, CONSEQUENTIAL, INCIDENTAL OR OTHER DAMAGES OR LOSSES DUE TO DELAY IN SCHEDULED DELIVERY."  Id. (emphasis in original).  Likewise, the remedies section stipulates that "[i]n no event shall Seller, or any subsidiary or division thereof be liable for incidental, consequential or other damages or losses resulting from breach of warranty including, without limitation, labor costs, loss of use of other equipment, third party repairs, personal injury, emotional or mental distress, improper performance or work, penalties of any kind, loss of service of personnel, or failure of equipment to comply with any federal, state or local laws."  Id.

[5]Defendant's assertion that plaintiff could operate the plant without the silo is belied by the fact that no attempt to run concrete was made until after the silo arrived and was connected.

had installed, which gave it an additional six inches of clearance.[6]  In addition, there were welding defects in both the in truss silo[7] and the auxiliary silo.  Logan reported that the welding on the in truss silo was so deficient that upon filling with fly ash, it "leaked everywhere."  Plaintiff's Exhibit 19 at 1.  Likewise, deficient welds on the auxiliary silo caused it to leak around the aeration mechanism.  Id.  The welding problems had to be remedied immediately; otherwise the silos would not hold cementitious material and the plant could not operate.  An employee of plaintiff thus repaired the welds and defendant agreed to pay plaintiff $1,200.00 to reimburse it for making those repairs.  In addition to the charging height and welding problems, plaintiff experienced problems with the computer used to run the plant and with spillage of aggregate from the aggregate bins.  Each time plaintiff attempted to batch 10 cubic yards of concrete, spillage of 300 to 400 pounds of aggregate would occur.  The spilled material could not be reused since it was contaminated.  Deposition of James Taylor at 56-7.  Finally, defects in the water tank and water tank float valve assembly caused the water tank to overflow.

In a December 8, 2005 memorandum, Logan informed defendant of the numerous defects in the plant and the efforts that had been made to solve them.  Specifically, he reported:

---

[6]The truck lane was approximately 20 feet long by 12 feet wide and six inches deep.  While removing the concrete lane allowed plaintiff sufficient clearance to load its front-load trucks, it created numerous other problems.  Because the truck lane was dirt, it was not as easy to clean spillage and the lane had to be re-graded at least daily.

[7]The in truss silo is an integral component of the batch plant.

The plant does not elevate to 13'6"; it sits at 13' ½".  **I couldn't adjust the height any higher.**

* * *

We had to cut off the end of the ladder to the auxiliary silo so it could sit on the slab.  The quote states that the auxiliary silo can sit on a slab or pads. . . .

Upon filling the plant silo with fly ash, the augers and silo leaked everywhere.  They stopped the bulk truck filling the plant and began to weld inside/outside the silo and caulked the augers and gates. . . .

The auxiliary silo was leaking around the aeration welds. **They fixed the welds.** . . .

The water float that controls the flow of water to the water tank was sticking.  Thus overflowing.  The knuckle and pivot point was rubbing against the bottom of the cover plate; there was no tolerance between the two metals thus rubbing a hole in the cover plate.  Note:  There is a tremendous amount of vibration due to the compressor positions below the water tank.  **David [Kelly] has placed spacers to eliminate the friction between the two metals.** . . .

The customer had to cut the concrete slab to get their fronts [front discharge mix trucks] under the plant.

Now the rear discharge trucks have a rough time lining up under the cement and aggregate/water tubes manifold; causing a mess on the ground.

The aggregate gates line up with the aggregate batcher on the silo side of the plant, but the aggregate gates do not line up with the aggregate batcher on the compressor side of the plant.  Thus causing a mess under the plant. . . .

* * *

7

Welds on and around the plant silo are questionable

1.  welds appear to be downhill in most cases[8]
2.   there are pinholes or incomplete welds; no overlapping throughout the plant.
3.  the customer has pointed out that the inside welds on the plant silo appear to be only adhering to one sheet of steel with no or very little penetration of the metal, when the weld should be a 90° v-weld adhering to both sheets of steel. . . .

Therefore they question the integrity of the silo.  They feel the only thing holding the plant together is the outside welds.

Plaintiff's Exhibit 19 at 1-2 (emphasis in original).  None of the interim steps taken to get the plant operational were intended as a permanent solution.  The court finds defendant was timely and adequately notified of these and other defects with the batch plant[9] and that the welding defects, lowered charging height, aggregate spillage, water tank, and float valve assembly were covered under the express warranty.

---

[8]This is the court's best guess at this statement as the language in this and numerous other documents was obscured with a stamp indicating the document had been produced by defendant in this case.  Defacing exhibits in this manner is contrary to the spirit of the federal discovery rules.

[9]From November 2005 to April 2006, Jim Johnson was defendant's executive in charge of oversight of warranty repairs for equipment such as the Rustler III.  He testified that to make a warranty claim, a customer could contact its salesman.  Deposition of James Paul Johnson at 64. Larry Meyer, the person responsible for oversight of warranty claims after April 2006, confirmed customer contact by telephone was sufficient to request warranty service.  Defendant's Customer Service Manager, George Wisner, also confirmed telephone contact was sufficient.  Plaintiff repeatedly told Logan of its concerns with the plant and Steve Brown, plaintiff's main operator of the Rustler III, contacted Wisner directly on a number of occasions.  Defendant also had written descriptions of the defects in the plant from its own employees and plaintiff's counsel.  *See* Plaintiff's Exhibits 17, 18, 19, 22, 31.

On December 20, 2005, Eaton met with defendant's representatives, including George Wisner, Vandeventer, and Logan, to discuss the problems plaintiff was experiencing with the plant.  After this meeting, Jim Johnson sent a letter to plaintiff offering to make the following repairs:

1.    Grind the welds on the in truss silo weldment and supporting structure and weld them correctly.  Our intention is to have at least two welders to work on the plant for 2-3 days.  During this time the plant will not be able to operate.

2.    Install a stabilize gusset plate between the silo fill line and the silo shell.

3.    Provide the parts and install an aggregate batcher extension to eliminate the material spillage on the air compressor side.

4.    We will replace the water valve for the water holding tank with the correct clearance between the lid and the water valve mechanism.

5.    As a sign of good faith and to alleviate [your] height problem with front discharge trucks we will exchange the pads you are currently using with a set that will allow you to raise the plant up to a total of 13'-7¾" steel clearance [below] the truck shroud. We are also going to provide you at no extra cost a longer Gum rubber shroud for the conveyor discharge head and cement chute to compensate for the height change.

Plaintiff's Exhibit 21.  On December 27, 2005, counsel for plaintiff sent defendant a letter rejecting the batch plant and requesting a refund of the purchase price.

Plaintiff's Exhibit 22.  Despite this letter, the parties continued to negotiate regarding

repairs and on February 1, 2006, the parties agreed defendant would reimburse plaintiff $15,500.00 for the cost of welding repairs provided by L&M Welding. Plaintiff's Exhibit 24.  Johnson also agreed to provide paint to cover the welding repairs.  Deposition of James Paul Johnson at 129.  On March 2, 2006, plaintiff notified Johnson that L&M had completed the welding repairs and asked that Eaton be contacted "to arrange for the other repairs to be started."  Plaintiff's Exhibit 26. Johnson responded by return e-mail that he had "made arrangements for our serviceman to visit the site."  Id.  A serviceman, however, was not dispatched to plaintiff's work site until April 17, 2006 when David Kelly arrived.  On April 19, 2006, Kelly installed a heap plate to the aggregate bin in an attempt to resolve the spillage issue.  That same date, however, Kelly acknowledged plaintiff did not believe the heap plate would resolve the aggregate spillage.  Kelly reported to Wisner "Steve Brown is now saying the bin extension is going to cause even more problems with the upper clam gates not closing [be]cause the lower bin material will stack higher with bin extension."  Plaintiff's Exhibit 30.  Kelly also indicated that, unless expressly instructed to do so, he would not return to the work site nor would he answer phone calls from plaintiff's employees.  Id.  Likewise, Logan ceased all communications with plaintiff in April 2006 after he was told by his superiors to do so.  From April through August 2006, plaintiff's attempts to contact defendant were ignored.

On August 17, 2006, counsel for plaintiff sent a Notice of Defect - Demand for Warranty Service ("Notice") to defendant.   Plaintiff's Exhibit 31.   The Notice

requested defendant (1) repair or replace the defects in the batch plant that were identified in November 2005, including the inability to batch 10 cubic yards of material without spillage, the defective water tank, the defective float valve system, the non-conforming charging height, and the batch hopper boots that were too short; (2) deliver the paint to cover the welding repairs made by L&M Welding; and (3) correct newly identified problems with aeration and the high bin indicators.[10]  Id. While the twelve month express warranty was still in effect when the Notice was sent, defendant made no attempt to correct the aeration problem or the high bin indicators, nor did it respond to plaintiff's concerns regarding the charging height and batch hopper boots.  Defendant did, however, respond to certain items listed in the Notice.[11]  On September 14, 2006, defendant, through legal counsel, offered (1) to provide a service technician "to assist [plaintiff] in maximizing the production capacity of the Plant"; (2) to provide plaintiff with ten gallons of paint free of charge; and (3) to provide at no cost to plaintiff a new water tank and float valve assembly.  Plaintiff's Exhibit 93.  Notwithstanding these promises, no technician was ever dispatched to plaintiff's location after this letter was sent, nor is there any record that the paint referred to in the September 14, 2006 letter was sent to plaintiff.  Furthermore, at no

---

[10]The letter also stated that the power box for the batch plant was not working properly.  This problem, however, was resolved before the letter was transmitted to defendant.

[11]Counsel's letter states that "[i]n your letter dated August 17, 2006 . . . you raised four points of concern".  Plaintiff's Exhibit 93.  This is incorrect.  The August 17, 2006 letter raised nine points, one of which was moot.  See supra n.10.  Defendant's failure to respond to the other four issues is baffling, since the record reflects defendant received both pages of the August 17, 2006 letter.  Plaintiff's Exhibit 31 at PA 00824.

time did defendant repair the non-conforming charging height of the plant, and it did not even attempt to replace the defective water tank and float valve system until October 18, 2006, one day after plaintiff filed this action.[12]

After plaintiff initiated this action seeking rescission,[13] it used the plant eight times on six different days to produce 71 cubic yards of concrete.  Defendant's Exhibit 61 at 036706, 036907, 036911, 036919, 036964, 039066, 039072-73.  This usage was de minimis compared to plaintiff's prior usage of the plant, amounting to less than 0.5 percent of the total concrete produced by plaintiff using the Rustler III. Thereafter, defendant did not accept tender of the batch plant, nor did it give plaintiff any instructions regarding the equipment.  Plaintiff stored the equipment from October 2006 through March 2007, when it began to market the equipment for sale. After plaintiff's attempt to sell the plant and silo through an outside vender failed, plaintiff sold the equipment to Desert Construction for $240,000.00.  Plaintiff's Exhibit 98.  In January 2006, plaintiff ordered a replacement plant and silo from Coneco for

---

[12]A replacement tank was not ordered until October 18, 2006.  Plaintiff's Exhibit 35 at 0442. Although Wisner testified it should have taken no more than three days to manufacture the tank, he had no explanation for why the tank was not shipped to plaintiff until November 30, 2006.  When the tank was finally shipped, defendant did not notify plaintiff to expect it.  The tank arrived in December 2006 and plaintiff refused the shipment because it was no longer using the plant and had filed this action.

[13]The parties' contract provided that "[a]ny action for breach of the agreement  must be commenced within one (1) year after the cause of action has accrued."  Plaintiff's Exhibit 13 at 2 of 2; Plaintiff's Exhibit 14 at 2 of 2.  As the non-conforming charging height was readily apparent upon installation of the plant, the one-year contractual statute of limitations was close to expiring at the time plaintiff filed this action.

$502,000.00;[14] plaintiff took delivery of the replacement plant in October 2006.  *See*

Plaintiff's Exhibit 96.

> Plaintiff alleged defendant breached the parties' contract by:
>
>> (1) failing to oversee the installation of the Concrete Batch Plant and Silo, (2) failing to deliver the Silo in a timely manner, (3) delivering products substantially inferior to those advertised and set forth in the Equipment Proposal, (4) delivering equipment which was defective and not suited for the purpose for which it was sold, (5) failing to repair and replace the defective and/or substandard Concrete Batch Plant and Silo, and (6) billing Precision Aggregate for items repaired or replaced pursuant to Terex's warranty obligations.

Complaint at ¶ 26.  In its summary judgment order, the court found plaintiff was not

entitled to present a claim for breach of contract based on the delivery date of the

silo as no delivery date had been specified in the contract.  Order at 10-11 (Doc. No.

84).  Based on the evidence presented at trial, the court finds plaintiff's remaining

claims for breach of contract are without merit, as defendant did provide personnel

to help plaintiff install the equipment and plaintiff's remaining contract claims are

subsumed in its warranty claim.

Plaintiff's warranty claim is governed by Article 2 of the Uniform Commercial

Code as adopted in Oklahoma.  The Code provides that "[a]ny description of the

goods which is made part of the basis of the bargain creates an express warranty

---

[14]Plaintiff, however, is not seeking this amount as damages for cover because the Coneco plant has additional features that were not included on the Rustler III.  Plaintiff therefore seeks $416,977.00 as the cover purchase price.

that the goods shall conform to the description."   12A O.S. § 2-313(1)(b).   The charging height and ability of the plant to consistently produce 10 cubic yards of concrete per batch were material terms to plaintiff; it would not have purchased the Rustler III absent defendant's representations that it could perform as indicated in the specifications, the Equipment Proposals, and defendant's oral representations. These descriptions created a warranty as a matter of law.   In addition, the Terms of Sale provided an express warranty that – for a period of twelve months – all defects in material or manufacture of the equipment would be repaired or replaced.

The plant as delivered did not conform to the charging height specification, nor did it consistently batch 10 cubic yards of concrete without aggregate spillage. Nonetheless, the court finds plaintiff's retention and continued use of the plant and silo after its December 27, 2005 rejection letter constitutes acceptance of the plant.[15] Acceptance, however, can be revoked.

> In Oklahoma, a buyer may revoke his acceptance of goods of a nonconforming nature by notifying the seller within a reasonable time.   The question of whether a buyer's revocation of an acceptance is timely is, as with rejection, a question of fact.   A buyer who properly revokes has the same rights with regard to the goods involved as if he had rejected them.

---

[15]Section 2-606(1) of the Oklahoma Uniform Commercial Code provides that a buyer accepts goods if, after a reasonable opportunity to inspect, the buyer tells the seller the good are conforming or that it will accept the goods despite the nonconformity, or the buyer fails to effectively reject the goods, or the buyer does any act inconsistent with the seller's ownership.   12A O.S. § 2-606.

14

CMI Corp. v. Leemar Steel Co., Inc., 733 F.2d 1410, 1415 (10th Cir. 1984). "Whether a party's revocation of acceptance is effective in any given case is dependent upon the facts and circumstances surrounding the revocation, and is normally a question for the trier of fact." Triad Systems Corp. v. Alsip, 880 F.2d 247, 249 (10th Cir. 1989). As plaintiff's acceptance was based on defendant's continuing promises to repair or replace the defective equipment, the court must determine whether defendant did so in a seasonable manner. Defendant's response to plaintiff's warranty claims likewise determines the remedies available to plaintiff under the Code. "Where the seller is afforded a reasonable opportunity to correct the defect and fails timely to respond or is repeatedly unsuccessful in the efforts to meet the warranty-imposed obligation, the limitation of remedy is deemed to have failed of its essential purpose". Osburn  v. Bendix Home Systems, Inc., 613 P.2d 445, 449-50 (Okla. 1980). In Oklahoma, if a limited remedy fails of its essential purpose, the buyer is entitled to all remedies under the Code, including consequential and incidental damages.[16] Anderson v. Dow Agrosciences LLC, 262 F. Supp. 2d 1280, 1291 (W.D. Okla. 2003); Osburn, 613 P.2d at 450; Collins Radio Co. of Dallas v. Bell, 623 P.2d 1039, 1051 (Okla. App. 1980).

---

[16]The court recognizes this is no longer the majority rule and that the case relied on by the Oklahoma Supreme Court in Osburn has been abrogated. See Razor v. Hyundai Motor America, 854 N.E.2d 607, 616-622 (Ill. 2006), cert. denied, 127 S. Ct. 1156 (2007) (abrogating Adams v. J.I. Case Co., 261 N.E.2d 1 (1970)). Nonetheless, as the court is sitting in diversity, it must follow Oklahoma law as pronounced by the state's highest court. Perlmutter v. U.S. Gypsum Co., 54 F.3d 659, 662 (10th Cir. 1995).

Based on the evidence presented, the court finds plaintiff was entitled to revoke its acceptance of the Rustler III and did so in a seasonable manner given the parties' course of conduct which included negotiations over an extended period of time.[17]  Moreover, the court finds the contractual limited remedy failed of its essential purpose due to defendant's failure to either repair or replace the defective equipment.  Defendant's argument that plaintiff's removal of the concrete truck lane solved the problem with the charging height is ludicrous.  Removing the truck lane was a temporary fix by *plaintiff* solely to make the plant operational for its equipment.  This change did nothing to resolve the plant's failure to conform to the specifications.  Johnson realized this and authorized exchanging "the pads you are currently using with a set that will allow you to raise the plant up to a total of 13'-7¾" steel clearance [below] the truck shroud.  We are also going to provide you at no extra cost a longer Gum rubber shroud for the conveyor discharge head and cement chute to compensate for the height change."  Plaintiff's Exhibit 21.  Although these items were promised in December 2005, they were never provided.  Moreover, defendant did not even attempt to replace the water tank and float valve assembly until more than a year after delivery of the plant.  Even with respect to the welding repairs made by L&M Welding – which defendant paid for – defendant did not follow through by providing paint to cover those repairs.  Finally, defendant never paid for the initial

---

[17]Plaintiff's filing this action constitutes sufficient notice to defendant of its revocation of acceptance.

16

welding repairs made by plaintiff, even though it had agreed to compensate plaintiff by paying it $1,200.00.[18]

Contrary to defendant's pre-trial assertions, there was no evidence that plaintiff delayed defendant's providing any warranty repairs.  The court finds plaintiff not only notified defendant orally and in writing of the defects in the equipment, but also clearly informed defendant that it was ready to proceed with warranty repairs.[19] All delays occurred on defendant's end, and it was *defendant* who ceased all communications in April 2006.

A buyer who revokes acceptance has the same rights under the Code as if he had rejected the goods.  12A O.S. § 2-608(3).  Likewise, as the limited remedy failed of its essential purpose, plaintiff is entitled to all remedies under the Code, including consequential and incidental damages.  One of the remedies a buyer has upon revocation is the right to cancel – that is, to rescind – the contract and to recover the purchase price.  12A O.S. § 2-711(1).  In addition, the buyer has the right to "cover", that is to purchase substitute equipment.  Id.; 12A O.S. § 2-712(1).  In the event the buyer elects to cover, it may, in addition to the purchase price, "recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages".  12A O.S. § 2-712(2).

---

[18]The $1,200.00 parts credit given to plaintiff was contrary to the parties' agreement, which provided for a cash payment.

[19]Except for the initial welding repairs made by plaintiff's employees, plaintiff could not itself repair or replace the defective and non-conforming equipment because any modification of the equipment would invalidate the express warranty.  *See* Plaintiff's Exhibit 13 at 2 of 2.

17

Incidental and consequential damages include expenses incurred in the transportation, care and custody of the rejected goods, and losses resulting from needs the seller knew about at the time of contracting. 12A O.S. § 715. In addition, upon revocation of acceptance, the buyer is entitled to sell the non-conforming goods for the seller's account if the seller does not instruct the buyer otherwise.[20] 12A O.S. § 2-711(3).

Based on the law and the evidence presented, the court finds plaintiff is entitled to $191,224.00 as damages. This amount represents the purchase price for the Rustler III and silo ($342,818.00) minus the amount plaintiff received when it sold the equipment for defendant's account ($240,000.00) [$102,818.00], plus the difference between the cover price ($416,977.00) and the contract price ($342,818.00) [$74,159.00], plus the amount defendant agreed to pay for the initial welding repairs ($1,200.00) and the cost of transporting the Rustler III and auxiliary silo to plaintiff's work site ($13,047.00). The court does not award as damages the costs associated with the aggregate bin extension or the rubber gum shroud, as plaintiff did not pay for these items. Nor does the court find plaintiff is entitled to recover the cost of leasing a portable plant in Las Vegas as there was no evidence

---

[20]Under section 2-711, a buyer who has justifiably revoked acceptance has a security interest in the goods in his possession. 12A O.S. § 2-711(3). The court does not deem plaintiff's minimal use of the plant after it filed this action as inconsistent with its revocation of acceptance. Plaintiff's limited use of the plant clearly did not exceed its security interest, as it had paid for the equipment in full. *See* Yates v. Clifford Motors, Inc. 423 A.2d 1262, 1271-72 (Pa. Super. 1980).

defendant knew of this particular requirement at the time of contracting.  *See* 12A

O.S. § 2-715(2)(a).

 In sum, the court finds in favor of plaintiff and against defendant on plaintiff's

breach of express warranty claim and awards damages in the amount of

$191,224.00.  Judgment will issue accordingly.

 It is so ordered this 17th day of January, 2008.

*Tim Leonard*
_____
TIM LEONARD
United States District Judge
